IN THE MATTER OF McDUEL

Docket No. 78349. Submitted March 12, 1985, at Lansing.—Decided
    May 7, 1985.

The Michigan Department of Social Services petitioned the Alle-
    gan Probate Court to terminate the parental rights of the
    parents of David McDuel, a minor, on the basis of neglect. The
    petition with respect to the putative father, Ronnie Cross,
    alleged that he had not seen the child since 1981. The petition
    with respect to the mother, Pearl McDuel, alleged that she had
    failed to maintain a fit home for the child and would be unable
    to maintain a fit home in the future because she was disabled
    with multiple sclerosis and was confined to a wheelchair. The
    probate court, George A. Greig, Jr., J., terminated the rights of
    the mother, finding that her affliction and the circumstances
    brought on by that affliction had "in the broad general sense"
    resulted in neglect on her part within the meaning of the
    juvenile provisions of the probate code, and that her physical
    illness was similar in effect to a long-term mental illness which,
    under the juvenile provisions of the probate code, will permit
    termination of parental rights. Pearl McDuel appealed. *Held:*

    1. Parental rights may not be terminated on the basis of a
    parent's physical incapacity in the absence of a showing of
    culpable neglect. Since the proofs failed to show any disregard
    of parental duties by the mother but rather, at best, showed a
    physical inability to fully provide for the child, the probate
    court erred in terminating the mother's parental rights on the
    basis of neglect.

    2. The normal depression which may accompany a physical
    illness is insufficient to establish a mental illness under the
    statute permitting termination of parental rights by reason of a
    parent's mental illness. Furthermore, since the Legislature

REFERENCES FOR POINTS IN HEADNOTES
[1] 59 Am Jur 2d, Parent and Child §§ 8, 9, 26, 27.
[1-4] Validity of state statute providing for termination of parental
    rights. 22 ALR4th 774.
[2, 4] 59 Am Jur 2d, Parent and Child §§ 39, 40.
    59 Am Jur 2d, Parent and Child § 54.
[3] 59 Am Jur 2d, Parent and Child § 10.

specifically made long-term mental illness a basis of termination of parental rights but failed to provide for such termination for physical illnesses, courts should not usurp the powers of the Legislature by judicially expanding the scope of the statutory provisions relative to termination of parental rights by ruling that the effect of a long-term physical illness is the same as the effect of a long-term mental illness.

Reversed and remanded.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — BURDEN OF PROOF.

The state bears the burden of proving by clear and convincing evidence that termination of parental rights is warranted.

2. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — CHILD NEGLECT — PHYSICAL INCAPACITY.

Termination of parental rights by reason of neglect entails a showing of culpability on the part of the parents through either intentional or negligent disregard of the child's needs; parental rights should not be terminated on the basis of neglect where the needs of the child are not fully met because of the mere physical incapacity of the parents to provide for those needs where there has been no culpable disregard of duty by the parents; accordingly, it is error for a probate court to terminate parental rights of a physically disabled parent on the basis of neglect where the proofs fail to establish culpable neglect by that parent of the needs of the child (MCL 712A.19a[e]; MSA 27.3178[598.19a][e]).

3. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — JUDICIAL CONSTRUCTION.

Parental rights are fundamental in nature; accordingly, courts should be reluctant to expand beyond the specific categories set forth in the juvenile provisions of the probate code the instances in which parental rights are terminated.

4. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — MENTAL ILLNESS — PHYSICAL INCAPACITY.

It is error for a probate court to terminate parental rights on the basis that a physical disability was similar in effect to a mental illness, since the Legislature specifically made mental illness for a period of two years or more a basis for termination of parental rights but did not include physical illness or disability as a basis for such a termination of parental rights (MCL 712A.19a[c]; MSA 27.3178[598.19a][c]).

*Fred R. Hunter, III,* Prosecuting Attorney, and

*Michael L. Buck,* Assistant Prosecuting Attorney, for the Department of Social Services.

*James D. Stone,* for David McDuel.

*Stephen E. Sheridan,* for Pearl McDuel.

Before: SHEPHERD, P.J., and V. J. BRENNAN and C. JOBES,* JJ.

SHEPHERD, P.J. Respondent McDuel appeals as of right from an April 24, 1984, probate court order which terminated her parental rights and placed her four-year-old son in the permanent custody of the probate court. MCL 712A.19a; MSA 27.3178(598.19a). We reverse and hold that:

A. Parental rights may not be terminated on the basis of a parent's physical incapacity in the absence of culpable neglect.

B. The normal depression which may accompany a physical illness is insufficient to establish a mental illness under the statute permitting termination of parental rights by reason of a parent's mental illness.

Respondent McDuel is the mother of David McDuel, born March 18, 1980. The putative father, respondent Ronnie Cross, has had no contact with the child or the mother since 1981. Respondent McDuel, age 21, is permanently disabled with multiple sclerosis and confined to a wheelchair. She first learned of her disability when the child was three months old. Until January 21, 1983, the respondent resided with her mother. A chore service provider from the petitioning department came into the home nine hours per week to assist with the care of the child. At one point, respon-

---

* Recorder's Court judge, sitting on the Court of Appeals by assignment.

dent's aunt moved into the house to help care for the child. However, in January, 1983, the aunt left after a disagreement concerning the family budget.

After the aunt moved out, petitioner became concerned that the child's needs were not being met since respondent and her mother were not physically capable of meeting them. The department successfully petitioned the probate court for removal of the child from the home and placement into foster care on January 20, 1983. In addition, the probate court appointed a guardian and conservator for respondent. Subsequently, respondent was moved to a nursing home because she was in need of 24-hour care.

There was testimony at the dispositional hearing that prior to January, 1983, respondent's home was cluttered with dirty laundry and with other items from kitchen cupboards, table and counters. Respondent's brother lived in the home and assisted in preparation of meals, but was unwilling to provide the personal care and attention needed by respondent and her son.

A children's protective service worker testified that the child did not receive the stimulation and supervision necessary for his personal growth since respondent was not able to react or play with her son to any great extent. This witness claimed that the child was being treated as an "errand boy" for respondent. The worker also stated that the child was developing normally, albeit with some deficiency in his verbal skills. The tasks respondent expected him to perform were often beyond his ability. The worker also reported that at one time a home health aid found the child "with a gun in his hand".

There was conflicting medical testimony by respondent's treating physicians concerning her con-

dition. One doctor stated that respondent was able to feed herself and perform normal daily care, that she could stand only with assistance and needed help in making a complete clothing change and that while there is no cure for multiple sclerosis, there was a chance for some improvement in her overall strength. Another physician stated that respondent's overall condition had deteriorated, that her disease had affected her emotional and mental functioning and that she experienced mood disorders. The witness, a neurologist, opined that respondent seemed inappropriately "euphoric" and sometimes unaware of the significance of her disease and that respondent was also "dull" and "flat" at times, but that witness was unsure whether this condition resulted from depression or not. However, another physician stated that he had not noticed any loss of mental function by respondent and that multiple sclerosis is not typically a disease which affects a person's capacity to think and reason.

Prior to entering its order of termination, the probate court gave the parties 90 days to study any possible alternatives. It was determined that respondent and the child needed 24-hour care. There are no sources of funds for such care. A check of local volunteer agencies offered no solutions.

Respondent stated that she did not want to have her parental rights terminated because she loved the child and felt that she could adequately care for him.

The probate court ruled that because of respondent's affliction and the circumstances brought on by her disease she had, "in the broad general sense", neglected her child. MCL 712A.19a(e); MSA 27.3178(598.19a)(e). Alternatively, the court ruled that respondent was unable to care for her child

for a period in excess of two years due to a mental illness as provided in MCL 712A.19a(c); MSA 27.3178(598.19a)(c). The judge admitted that this was "more the case" of a physical illness than a mental affliction, but he stated that the matter "would fit right in there [i.e., into MCL 712A.19a(c)] by just merely changing the word mental illness to physical illness". The judge concluded that, given the expectation that respondent's illness would last indefinitely, termination of her parental rights was "in the best interests of the child".

"The state bears the burden of proving by clear and convincing evidence that termination of parental rights is warranted." *In the Matter of Bidwell,* 129 Mich App 499, 504; 342 NW2d 82 (1983); *In the Matter of Laflure,* 48 Mich App 377; 210 NW2d 282 (1973), *lv den* 390 Mich 814 (1973). This Court will affirm the probate court's findings unless they are clearly erroneous. *In the Matter of Irving,* 134 Mich App 678; 352 NW2d 295 (1984); *In the Matter of Schejbal,* 131 Mich App 833, 837; 346 NW2d 597 (1984).

We find no clear error in the probate court's finding that respondent is unable to provide or care for her child as a result of her physical illness. This conclusion has ample support in the record. Rather, we find clear legal error in the probate court's conclusion that this situation provides a basis for termination of respondent's parental rights for reasons of "neglect" or "mental illness". MCL 712A.19a, subds (c) and (e).

The probate court may terminate the respondent's parental rights if he or she "is unable to provide a fit home for the child by reason of neglect". MCL 712A.19a(e). In this case, the probate court concluded that respondent's ability to provide for the child constituted neglect, "in the

broad general sense". We reject this construction of the statute. "[A]n order for permanent custody due to neglect must be based upon testimony of such a nature as to establish or seriously threaten neglect of the child for the long-run future." *Fritts v Krugh,* 354 Mich 97, 114; 92 NW2d 604 (1958). "There must be real evidence of long-time neglect, or serious threats to the future welfare of the child, * * *." *Fritts, supra,* p 116; see also *In the Matter of Moore,* 134 Mich App 586, 593; 351 NW2d 615 (1984). We agree with respondent's contention that the word "neglect" necessarily entails some degree of culpability on her part, by way of either intentional or negligent disregard of the child's needs. In *In the Matter of Bailey,* 125 Mich App 522, 527; 336 NW2d 449 (1983), this Court stated as follows:

> "Appellants argue that their parental rights were terminated because of their inability to care for their child due to their mental deficiency. Further, they argue that, since there was no showing of intentional or culpable neglect on their part, the probate judge erred in terminating parental rights for the reason of neglect rather than mental deficiency. We agree.
>
> "Neglect per se is defined neither in Michigan's statute nor case law. In general, however, MCL 712A.2(b); MSA 27.3175(598.2)(b) provides the basis for the assumption of jurisdiction by the juvenile division of the probate court. This statute would seem to support appellants' argument that a termination for reasons of neglect requires a finding of some intent or culpability. Jurisdiction over a child may be assumed when a parent who is 'able to do so' fails to properly care for the child."

Webster's Third New International Dictionary defines "neglect" as "to give little or no attention or respect to: consider or deal with as if of little or no importance * * * to carelessly omit doing".

Petitioner, in support of the probate court's "broad" construction of the concept of neglect, refers to 47 Am Jur 2d, Juvenile Courts, § 24, p 1005, where it is stated that neglect "embraces wilful as well as unintentional disregard of duty". This reference offers no aid to petitioner's position, for an inability to provide for one's child cannot be equated with a "disregard" of that duty. We believe the commentators only meant to say that a negligent failure to fulfill parental duties may support a finding of neglect and that no showing of specific intent is required, not that a sheer inability to do so is sufficient. Like the panels which decided *Moore, supra* and *Bailey, supra,* we are of the view that to be neglectful within the meaning of the statute respondent must have committed some act or omission which is blameworthy. We cannot assign blame to one who is incapacitated by disease. The probate court erred by terminating respondent's parental rights on this ground, since there was no evidence of real neglect in this case.[1]

The probate court's alternative basis for the order is MCL 712A.19a(c) which allows for termination of parental rights if the respondent "is unable to provide proper care and custody for a period in excess of two years because of a mental deficiency or mental illness". We read "mental

---

[1] Although not necessary to our decision, we do note the shallow nature of the evidence that respondent's home was unfit for the child. Many homes are "cluttered" with various items, if not all the time, at least at frequent intervals. It is hardly an unusual or alarming condition. There is no indication that this clutter posed any danger to the child. Similarly, it seems to us that many parents employ their children to run errands, yet could not be characterized as neglectful. If the child loves his mother (and there is some evidence in the record that he does), he may have performed such tasks willingly in an effort to ease the burden of respondent's disease. With regard to the incident with the gun, we observe that it was reported by way of hearsay. It is not indicated whether the weapon was loaded, operable, or even if it was a genuine firearm. At any rate, this isolated occurrence would be clearly insufficient for a termination of parental rights.

deficiency" as a synonym for low intelligence or mental retardation. There is no evidence that respondent is mentally deficient. The Legislature has elsewhere defined "mental illness" as a "substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life". MCL 300.1400a; MSA 14.800(400a).

The probate court admitted that respondent suffered from a physical illness, not a mental one, but nonetheless held that its order could be supported simply by judicial amendment of the statute, MCL 712A.19a(c), to include physical illness. This was error. If the Legislature had wished to include physically disabled parents within the statute they could have done so. We cannot usurp a legislative task, nor may we create a "common law" of justifications for termination of parental rights, based on the mere conceptual similarity of a given set of circumstances to those included in the statute.

Petitioner urges that the bases for termination of parental rights listed in MCL 712A.19a are not all-inclusive, citing *In the Matter of Sharpe,* 68 Mich App 619, 625; 243 NW2d 696 (1976):

"Moreover, we hasten to add that we do not view § 19a as setting forth the exclusive causes for termination of parental rights. The probate courts are given jurisdiction over all those children whose circumstances bring them within the definitions of § 2 of the juvenile code; and as to all such children, the probate courts are given the power of disposition under §§ 18 and 20 of the code, depending upon the discretion of the court in meeting the best interests of the child. The subparagraphs of § 19a must be viewed only as an illustrative enumeration of criteria which prima facie justify termination of parental rights; those criteria neither mandate permanent custody in every such case nor fore-

close permanent custody in other instances where the child is within the jurisdiction of the court and its best interests so require."

The above view has fallen into disfavor in the more recent decisions of this Court and rightfully so, we believe. As noted by the Supreme Court in *Fritts, supra,* p 115, the fitness of parents "must be measured by statutory standards". If the standards contained in the statute are not all-inclusive, then the probate court is left with no compass to guide its decision other than its subjective determination of the "best interests" of the child. *Sharpe, supra.* This is "totally inappropriate", *Fritts, supra,* p 115, since the child's best interests are not at stake in the parental rights termination proceeding. The issue is whether respondent's rights as a parent will be forever terminated. While the best interests of the child may be considered in arriving at an appropriate dispositional order if and when respondent's rights are terminated, they have no relevance to that determination. *Schejbal, supra,* p 836; *In the Matter of Barbara A Ernst,* 130 Mich App 657, 664-665; 344 NW2d 39 (1983); *In the Matter of Atkins,* 112 Mich App 528, 541; 316 NW2d 477 (1982), *lv den* 413 Mich 912 (1982). The proper standard is whether the state has proven respondent unfit by clear and convincing evidence according to statutory standards, not whether the child would be better off in a foster home. *Atkins, supra.* Due to the fundamental nature of parental rights, we are bound to this standard as a matter of constitutional law. *Santosky v Kramer,* 455 US 745; 102 S Ct 1388; 71 L Ed 2d 599 (1982).

Moreover, there are sound policy reasons for our reluctance to expand the statute to encompass physically disabling conditions. Such a decision

would empower probate courts to terminate the rights of parents disabled in motor vehicle accidents, for example. We do not believe the people of this state or their Legislature have favored a policy which adds insult to disabling injury by tearing apart what remains of the family unit following such catastrophic occurrences.[2] We firmly believe that petitioner has the child's interests at heart in this matter. Nevertheless, the Legislature may have had good reason to omit the phrase "physical illness" from § 19a. Being uncertain it was a mere oversight, we will not write that phrase into the provision.

Petitioner further argues that there was sufficient evidence of mental illness, namely, the testimony of the neurologist. We disagree. First, the probate court made no specific finding of mental illness, but merely found respondent unable to care for the child due to her physical condition. Second, we are not convinced that the Legislature intended "mental illness" to include depression resulting from physical illness. Assuming for the sake of argument that petitioner's statutory interpretation is correct, the record does not reveal clear and convincing evidence that respondent is mentally ill. The evidence was, at most, conflicting on this issue.

One physician testified that respondent had not lost her ability to function mentally and that a loss of reason is not characteristic of the disease. The neurologist disagreed with the latter opinion. However, his testimony with respect to respondent's condition was tentative, since he had little contact with her. He testified that respondent was

[2] The Adoption Code expresses a policy of severance of the child's natural family relationship and creation of an entirely new relationship with the adopting parents. MCL 710.60; MSA 27.3178(555.60). See, *Bikos v Nobliski,* 88 Mich App 157, 160-161; 276 NW2d 541 (1979).

at times too "euphoric" and at other times she was reserved in her behavior. We do not believe that the periodic moods which naturally accompany a serious illness can be characterized as "mental illness" within MCL 712A.19a(c) in the absence of proof that judgment, reason, or ability to function mentally is significantly impaired. MCL 330.1400a.

We realize the inevitable result of our decision is that the child cannot be adopted, even though the probate court has already ordered placement of the child for that purpose pending this appeal. MCL 710.41(2); MSA 27.3178(555.41)(2). Although "the child may be placed in a home for the purpose of adoption", the adoption itself cannot be ordered without affirmance of the order terminating respondent's parental rights. *Id.* However, we are not persuaded that termination of the disabled parent's rights is the proper strategy for petitioner to employ in this situation. Respondent's condition is an unfortunate and unavoidable tragedy. We refuse to compound that tragedy by forever severing her bonds with her only child, perhaps her main source of comfort. We hope that a family can be found which is willing to care for the child properly, even though adoption is precluded for the time being, and that the child will not be endlessly shuttled from one foster home to another. The petitioner will be acting in a more constructive fashion than it has in the instant proceedings if it helps the child find such a family.

Reversed and remanded for further proceedings consistent with this opinion.